Susan M. Curtis, executrix,[1] *vs.* Herb Chambers I-95, Inc.,[2] & others.[3]

No. 08-P-283.

Essex. January 16, 2009. - November 3, 2009.

Present: Trainor, Graham, & Rubin, JJ.

Further appellate review granted, 455 Mass. 1108 (2010).

*Practice, Civil,* Motion to dismiss. *Limitations, Statute of. Copyright. Federal Preemption. Jurisdiction,* Federal preemption. *Collateral Estoppel. Contract,* Implied covenant of good faith and fair dealing, Interference with contractual relations. *Consumer Protection Act,* Damages. *Damages,* Punitive.

The statute of limitations did not bar a civil action brought in Superior Court within one year of the dismissal in the Superior Court of an action that a Federal District Court had "transferred" to it, where in the circumstances, the earlier dismissal in the Superior Court was a dismissal of the original action for a matter of form within the meaning of G. L. c. 260, § 32. [666-667]

A Superior Court judge properly dismissed, for failure to state a claim on which relief could be granted, a civil action alleging, inter alia, violation of common-law trade dress, where, under the circumstances of the case, principles of collateral estoppel precluded the plaintiff from arguing that promotional materials underlying the trade dress claim had acquired "secondary meaning" or that they were fanciful and thus inherently distinctive [669-670]; moreover, the judge properly dismissed, for failure to state a claim on which relief could be granted, a claim against one of the defendants for breach of the implied covenant of good faith and fair dealing, where the plaintiff had no contract with that defendant [670].

The Federal Copyright Act, 17 U.S.C. §§ 101 et seq. (1976), did not preempt claims alleged in a civil action brought in Superior Court, where, assuming that the promotional materials underlying the claims were within the subject matter of copyright [667-668], the claims for breach of the implied covenant of good faith and fair dealing [670-672], interference with advantageous business relations [672], and unfair and deceptive trade practices

[1] Of the estate of Harold Curtis.

[2] Doing business as Herb Chambers Dodge.

[3] Silver Star, Inc., doing business as Herb Chambers Kia Lynnfield; Dave Dinger Ford, Inc., doing business as Herb Chambers Ford; Herb Chambers of Millbury, Inc., doing business as Herb Chambers Chrysler, Plymouth, Dodge; Herb Chambers of Rehoboth, Inc., doing business as Herb Chambers Kia; and Globe Specialty Products, Inc.

in violation of G. L. c. 93A [673] each required proof of at least one additional element that made those claims qualitatively different from a Federal copyright claim.

In a civil action, a claim of interference with advantageous business relations survived the death of the plaintiff, where the claim sought a remedy for an injury to a property interest [673]; likewise, a claim for multiple damages as a remedy for alleged unfair and deceptive trade practices in violation of G. L. c. 93A survived the plaintiff's death, where the multiple damages provisions of G. L. c. 93A not only vindicate the rights of an injured party, but are part of a legislative scheme designed to serve a broad public interest in the eradication of unfair and deceptive practices in trade or commerce [673-677].

CIVIL ACTION commenced in the Superior Court Department on February 8, 2007.

A motion to dismiss was heard by *Patrick J. Riley*, J.

*Robert S. Wolfe* for the plaintiff.

*Edward C. Cooley* for Herb Chambers I-95, Inc., & others.

*Carol E. Head* for Globe Specialty Products, Inc.

RUBIN, J. The plaintiff, Susan Curtis (plaintiff), as executrix of the estate of Harold Curtis (Curtis), appeals from the dismissal of her complaint alleging four counts against the defendants, five automobile dealerships (collectively, the Chambers defendants), and Globe Specialty Products, Inc. (Globe).

I.

The complaint alleges that Curtis, while doing business as Curtis & Associates, conceived an idea for advertising to be used by automobile dealerships and, as an original expression of that idea, designed and produced distinctive promotional materials. Curtis sold these materials to dealerships and provided, for a fee, marketing services such as direct mail campaigns. Specifically, Curtis designed, produced, and sold a particularly successful and distinctive advertisement that dealerships used as a direct mailer or newspaper insert. Curtis avoided using his promotional materials for competing dealerships in the same marketing area at the same time. This allowed his customers to distinguish themselves from one another and also insured the value of Curtis's promotional materials. Similarly, Curtis limited the frequency of use of his promotional materials to preserve their impact.

During 2000, Curtis contracted with the Chambers defendants to provide marketing services using his promotional materials. In late 2000, Globe approached and solicited Curtis for printing business. Curtis declined to do business with Globe.

Beginning in early 2001 and continuing at least until Curtis brought suit, Globe began printing and distributing promotional materials for the Chambers defendants. These promotional materials, which were substantially similar to those designed and produced by Curtis, were distributed by hand and through direct mailers and newspaper inserts. The Chambers defendants ceased doing business with Curtis.

Globe's promotional materials, which appeared in the same marketing areas at the same times as Curtis's promotional materials, confused Curtis's other customers, namely competing dealerships. Customers of these dealerships were similarly confused, and Curtis's promotional materials lost their impact, and value, due to the frequency of use of Globe's promotional materials. The complaint alleges that the defendants knew or should have known that their conduct would interfere with and impair Curtis's business. Curtis demanded in writing that the defendants cease their conduct, but the defendants ignored this demand. Curtis consequently lost both his credibility and the ability to sell his promotional materials and marketing services to dealerships in the same marketing areas as the Chambers defendants, sustaining damages.[4]

Curtis first filed a complaint in late 2001 in the United States District Court for the District of Massachusetts. That complaint contained two Federal and four State claims. The Federal claims alleged copyright infringement under the Federal Copyright Act, 17 U.S.C. §§ 101 et seq. (1976), and violation of the Lanham Act, the Federal trade dress statute, 15 U.S.C. § 1125 (1999). The State claims were for violation of common-law trade dress, breach of the implied covenant of good faith and fair dealing, interference with advantageous business relations, and unfair and deceptive trade practices in violation of G. L. c. 93A.

The Federal District Court granted summary judgment on the two Federal claims. The court found that Curtis had not registered

---

[4]Of course we voice no opinion whether any of these allegations are true. For present purposes, as we explain in the text, we must assume that they are true.

a copyright for the advertisement materials at issue. Copyright registration is a condition precedent to bringing a Federal copyright claim. 17 U.S.C. § 411(a). The court also granted the defendants' motion with respect to the statutory trade dress claim because Curtis failed to introduce sufficient evidence that his product had acquired "secondary meaning." See *Wal-Mart Stores, Inc.* v. *Samara Bros., Inc.*, 529 U.S. 205, 211 (2000). Trade dress develops "secondary meaning" when, although it is not inherently distinctive, it has acquired distinctiveness in that in the minds of the public it identifies the source of the product rather than the product itself. See *ibid.* The court concluded that it lacked jurisdiction to hear Curtis's remaining State claims and said, "Accordingly, the Court will transfer this case to the Essex Superior Court."

The Superior Court clerk subsequently opened a docket in the matter. The docket indicates that the case was "[t]ransferred from U.S. District Court of Massachusetts to Essex." The docket also indicates receipt of the first amended complaint in the Federal action, the defendants' answers to it, and an attested copy of the docket entries from the Federal District Court. Curtis did not file a new complaint, but he did pay the filing fee.

The defendants moved to dismiss the State claims in the Superior Court on the basis that the Federal District Court lacked the authority to transfer a case originally filed in the Federal District Court to the Superior Court. The motion judge found that procedural defects indeed required dismissal and dismissed the case without prejudice. That first motion judge noted that "Massachusetts law provides a procedure for the refiling of an action dismissed for any matter of form (if originally commenced within the applicable period of limitations) within one year after the dismissal." See G. L. c. 260, § 32.

By this time Curtis had died, and the plaintiff, his wife, as executrix of his estate, filed the instant complaint in Superior Court. This complaint alleges four State claims: count I for violation of common-law trade dress; count II for breach of the implied covenant of good faith and fair dealing; count III for interference with advantageous business relations; and count IV for unfair and deceptive trade practices in violation of G. L. c. 93A. The defendants' motion to dismiss was allowed by a second judge of the Superior Court.

## II.

The defendants brought their motion to dismiss the present complaint under both Mass.R.Civ.P. 12(b)(1), 365 Mass. 754 (1974), for lack of subject matter jurisdiction, and under Mass. R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), for failure to state a claim upon which relief could be granted. We review the allowance of a motion to dismiss under rule 12(b)(6) de novo. *Okerman* v. *VA Software Corp.*, 69 Mass. App. Ct. 771, 774 (2007). See *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 635-636 (2008) (articulating the standard for reviewing the adequacy of complaints). We accept as true all the allegations in the complaint and draw every reasonable inference in favor of the plaintiff. *Warner-Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 47 (1998). In reviewing the allowance of a motion to dismiss under rule 12(b)(1), we review questions of law de novo. See *id.* at 47-50. See also *Valentin* v. *Hospital Bella Vista*, 254 F.3d 358, 365 (1st Cir. 2001). A judge must "dispose[] of a Rule 12(b)(1) sufficiency challenge on the basis of the plaintiff's version of the relevant events, taking the well-pleaded facts as true and drawing all reasonable inferences in favor of the pleader." *Id.* (construing the parallel Federal rule). See *Callahan* v. *First Congregational Church of Haverhill*, 441 Mass. 699, 709 (2004). While "a judge may consider documents and other materials outside the pleadings," *id.* at 710, where no relevant fact is "in issue, the court's determination engenders de novo review." *Valentin* v. *Hospital Bella Vista*, *supra* at 365. See *Wooten* v. *Crayton*, 66 Mass. App. Ct. 187, 190 n.6 (2006) (addressing the treatment of disputed facts in a rule 12[b][1]) motion).

## III.

As an initial matter, we address the defendants' argument that dismissal under rule 12(b)(6) was appropriate because the statute of limitations had run by the time the plaintiff filed the instant complaint in the Superior Court. Curtis originally brought suit in the Federal District Court within the statute of limitations. The Federal District Court did not purport to dismiss the State claims in that case, but rather to "transfer" the "case" to the Superior Court. The Superior Court concluded that the Federal District Court lacked the authority to transfer the State claims under these circumstances and dismissed those claims without prejudice.

Within one year of that first Superior Court dismissal, the plaintiff filed the instant complaint.

General Laws c. 260, § 32, provides in relevant part that "[i]f an action duly commenced within the time limited in this chapter is dismissed . . . for any matter of form, the plaintiff . . . may commence a new action for the same cause within one year after the dismissal . . . of the original action." The defendants argue that the "original action" was the Federal action and that it was "dismissed" by the Federal District Court in the transfer order. They argue as a corollary to this that the first action dismissed by the Superior Court was not the "original action."

The procedural steps taken in this case present an extremely unusual circumstance. The Federal District Court purported to "transfer" the timely-filed Federal action, not to dismiss it. The "transferred" action was placed on the Superior Court docket. We think that, in light of the Federal District Judge's explicit order that the case be "transferred" to the Superior Court, the first Superior Court dismissal was a dismissal of the original action for a matter of form within the meaning of the statute. The filing of the instant complaint was, therefore, as the first Superior Court motion judge suggested, timely under G. L. c. 260, § 32.[5]

## IV.

Turning to the merits, the defendants' primary argument is that all of the plaintiff's State claims are preempted under the Federal Copyright Act (Act), and that, consequently, the Superior Court lacked subject matter jurisdiction. See 17 U.S.C. § 301(a). The leading Massachusetts case in this area is *Lee* v. *Mt. Ivy Press, L.P.*, 63 Mass. App. Ct. 538 (2005) (*Lee*). We explained there that there is a two-prong test to determine whether a particular State claim is preempted under the Act. *Id.* at 548. "First, the work in which rights are claimed must come within the subject matter of copyright as defined by the Act[, s]ee 17 U.S.C. §§ 102, 301(a), [and second, the] right asserted under State law must be equivalent to one or more of the 'exclusive rights' provided by § 106 of the Act." *Ibid.* Under § 106 of the

---

[5]In light of this conclusion, we need not address the plaintiff's alternative arguments concerning tolling of the statute of limitations.

Act, a copyright owner has "the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work . . . ; (2) to prepare derivative works . . . ; (3) to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) . . . to perform the copyrighted work publicly; [and] (5) . . . to display the copyrighted work publicly." We will assume for purposes of this opinion, without deciding, that the first prong of this test is met and that although Curtis did not prevail on his Federal copyright claim, his promotional materials are nonetheless within the subject matter of copyright.

With respect to the second prong, because a State claim is not preempted under the Act unless the right asserted is equivalent to one of the foregoing rights, the preemption provision does not immunize all conduct otherwise unlawful under State law simply because it is effected through the reproduction of printed materials. As *Lee* explains, "Federal courts have developed what is known as the 'extra element' test. . . . '[W]hen a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur.' " *Id.* at 549, quoting from *Rubin* v. *Brooks/Cole Publishing Co.*, 836 F. Supp. 909, 923 (D. Mass. 1993), in turn quoting from *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 723 F.2d 195, 200 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539 (1985). As this court explained in *Lee, supra* at 549:

> "The extra element inquiry is not accomplished merely by counting the elements of a claim. The fact that a State claim has more elements than a Federal claim will not necessarily save it from preemption. Rather, the dispositive factor is the nature of the claim asserted. Where the extra element renders the claim 'qualitatively different' from a Federal copyright claim, the State cause of action will survive a preemption challenge. In determining whether a State law claim is qualitatively different from a [Federal] copyright claim, courts look beyond the label and evaluate what right the plaintiff was seeking to protect or enforce and the theories on which the claim was brought." (Citations omitted).

A.

We turn first to the common-law trade dress claim. We need not determine whether this claim is preempted because we conclude that dismissal was required under rule 12(b)(6).

The plaintiff argues first that Curtis's promotional materials contained terms and images that had acquired "secondary meaning." See *Professional Economics, Inc.* v. *Professional Economic Servs., Inc.,* 12 Mass. App. Ct. 70, 74-75 (1981). However, the Federal District Court's determination that Curtis's promotional materials had not acquired secondary meaning precludes the plaintiff under the doctrine of collateral estoppel from seeking relief on this basis. See *Fireside Motors, Inc.* v. *Nissan Motor Corp. in U.S.A.,* 395 Mass. 366, 372-373 (1985).

The plaintiff also argues cursorily in the alternative that, "[a]t the very least, the images" in Curtis's promotional materials "were fanciful and not utilitarian." A finding that trade dress is fanciful and thus inherently distinctive can provide an alternative avenue to protection for such materials under the Lanham Act, the Federal trade dress statute. See *Datacomm Interface, Inc.* v. *Computerworld, Inc.,* 396 Mass. 760, 771 n.9 (1986). The plaintiff is, however, also collaterally estopped from seeking relief on this basis. Curtis litigated the question whether his promotional materials were fanciful in the Federal action and lost. Under the Federal trade dress statute, protection for fanciful materials is not available where the claim involves product design. See *Wal-Mart Stores, Inc.* v. *Samara Bros., Inc.,* 529 U.S. at 212-216. Curtis has not argued that the rule is any different under the common law of Massachusetts. Cf. *U-Neek, Inc.* v. *Wal-Mart Stores, Inc.,* 147 F. Supp. 2d 158, 178 (S.D. N.Y. 2001) (holding that a New York common-law trade dress claim is analyzed in the same manner as a claim brought under the Lanham Act). The Federal District Court found that this case involved only product design, noting correctly that "[t]o recover on a statutory trade dress claim involving product design, a plaintiff must prove that the product in question has acquired a secondary meaning." The determination that this case involved only product design was necessary to that court's decision. Having litigated and lost on this issue in the Federal action, and in the absence of any argument that the common-law rule regard-

ing product design differs from that under the Lanham Act, the plaintiff is collaterally estopped from raising it here. Cf. *Patterson* v. *Hantzes*, 5 Mass. App. Ct. 806, 807 (1977) (collateral estoppel prohibits relitigation of issues expressly or necessarily decided in prior litigation).

### B.

The next count alleges breach of the implied covenant of good faith and fair dealing. We begin by noting that this is a covenant implied in contracts. Since the plaintiff does not allege that Curtis ever had a contract with Globe, dismissal of this claim with respect to Globe was proper under rule 12(b)(6) regardless of the defendants' preemption argument. See *National Lumber Co.* v. *Canton Inst. for Sav.*, 56 Mass. App. Ct. 186, 187 n.3 (2002) (this court may affirm on any ground supporting the judgment below).

The plaintiff does allege that the Chambers defendants had a contract with Curtis. We noted in *Lee*, 63 Mass. App. Ct. at 550, that, "[i]n general, private contract disputes belong in State court." While "a breach of contract claim based solely upon a promise to refrain from taking one of the actions reserved exclusively to the copyright owner should be struck on preemption grounds," *id.* at 551, case law indicates that where contract claims allege breach of a promise to pay for the use of a work, they involve an extra element that is absent from a Federal copyright claim, which renders them qualitatively different from such a copyright claim. See *ibid.*; *Wrench LLC* v. *Taco Bell Corp.*, 256 F.3d 446, 457-459 (6th Cir. 2001), cert. denied, 534 U.S. 1114 (2002).

The complaint alleges that "[b]etween May of 2000 and November of 2000 Curtis contracted with and sold marketing services utilizing his distinctive and unique advertising materials to [some of the Chambers defendants]. . . . After some success, general management for the Chambers organization caused other Chambers dealerships outside Essex County to utilize the designs and services of Curtis." This amounts to an allegation that Curtis and the Chambers defendants had a contract under which the Chambers defendants promised to pay Curtis in exchange for which they were permitted to use his promotional materials. The defendants do not contend otherwise.

The shape of the implied covenant of good faith and fair dealing necessarily depends upon the terms of the contract. See, e.g., *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.,* 414 Mass. 200, 210-211 (1993). The plaintiff argues that the covenant of good faith and fair dealing implied in the contract here included a prohibition on the Chambers defendants' continued use of Curtis's promotional materials without paying for that use. The principal argument put forward by the defendants in support of their claim of preemption is that the only action complained of in the complaint is the act of copying.[6] The requirement that copyrighted materials not be used, by either reproduction or distribution, without permission of the copyright holder is one of the exclusive rights protected under the Act. 17 U.S.C. § 106.

A fair reading of the complaint indicates that it asserts not only that the materials were reproduced, but also that they were reproduced without compensation being paid to Curtis. Among the damages alleged are "the loss of the fair value for the use of [Curtis's] design by the Chambers Defendants." Although the reproduction of Curtis's promotional materials is a necessary component of the alleged breach, the claim for breach of the covenant of good faith and fair dealing requires proof of an

---

[6]The defendants acknowledge that under the implied covenant of good faith and fair dealing, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Druker* v. *Roland Wm. Jutras Assocs.,* 370 Mass. 383, 385 (1976), quoting from *Uproar Co.* v. *National Bdcst. Co.,* 81 F.2d 373, 377 (1st Cir. 1935), cert. denied, 298 U.S. 670 (1936). They also argue, however, that the implied covenant of good faith and fair dealing cannot survive after the explicit terms of the contract have been satisfied because "the fruits have been fully harvested."

This argument is foreclosed by the Supreme Judicial Court's decision in *Druker, supra.* In that case, the plaintiff "developed a concept for a restaurant at the Colonnade Hotel in Boston," "conceiv[ing] the distinctive name," Zachary's, and "designing a unique logotype and historical legend, as well as the entire design format and theme." *Id.* at 384. He entered into a contract with the defendant to provide decorating and consulting services for the hotel and restaurant. There was no allegation that the defendant had failed to comply with the express terms of its contract with the plaintiff. Nonetheless, the court held that the plaintiff's allegation that the defendant later revealed to others, for profit, the plaintiff's unique concept, design, logotype, legend, and theme, including the name of the restaurant, and used them in rendering interior design services for a hotel in Toronto, Canada, stated a claim for breach of the implied covenant of good faith and fair dealing. *Id.* at 385.

additional element, the implied promise to pay for any subsequent use of Curtis's promotional materials, which makes the claim differ qualitatively from a Federal copyright claim in the same way that ordinary breach of contract claims do. It therefore is not preempted.[7]

## C.

The third count alleges that Globe intentionally interfered with advantageous business relations existing between Curtis and the Chambers defendants and that Globe and the Chambers defendants intentionally interfered with advantageous business relations existing between Curtis and other dealerships. This claim involves "extra elements" rendering it qualitatively different from a Federal copyright claim. It therefore is not preempted. To succeed on an interference with advantageous business relations claim, a plaintiff must show that he or she had a business relationship with a third party from which he or she derived economic benefit, that "the defendants knew of that relationship," that "the defendants interfered with that relationship through improper motive or means," and that "the plaintiff's loss of advantage resulted directly from the defendants' conduct." *Cavicchi* v. *Koski*, 67 Mass. App. Ct. 654, 657 (2006). The rights involved in such a claim are not equivalent to any of the rights enumerated above that are protected under the Act. The fact that the alleged tortious conduct may have included reproduction of printed materials does not immunize the defendants from liability, nor does it render the two claims equivalent.

---

[7]The defendants have not claimed, either here or in the court below, that because of the actual terms of the contract, the implied covenant of good faith and fair dealing does not contain an implied promise to pay for any subsequent use of Curtis's promotional materials. Consequently, the plaintiff was not required to prove the precise terms of the contract (which are not spelled out in the complaint) in order to demonstrate that the Superior Court had subject matter jurisdiction. See *Callahan* v. *First Congregational Church of Haverhill*, 441 Mass. at 710-711 (plaintiff may not rely on the allegations in the complaint but must prove jurisdictional facts when defendant raises a "factual challenge" to those facts). We express no opinion concerning the actual terms of the contract, or whether in light of those terms the implied covenant of good faith and fair dealing prohibited the Chambers defendants from using the promotional materials without payment to Curtis.

## D.

Fourth, we turn to the claim under G. L. c. 93A. Our decision with respect to this claim is controlled by *Lee*. As that case makes clear, to the extent that the plaintiff's c. 93A claim is based on the same conduct as the interference with advantageous business relations claim, this claim, too, is qualitatively different from a Federal copyright claim and is thus not preempted. See *Lee*, 63 Mass. App. Ct. at 553.

## V.

The defendants make one further argument with respect to two of the claims, arguing that the interference with advantageous business relations claim and the claim for multiple damages under G. L. c. 93A do not survive Curtis's death. See *Pine* v. *Rust*, 404 Mass. 411, 417-418 (1989).[8]

As for the tortious interference with business relations claim, it suffices to note that the plaintiff alleges the loss of good will among the damages caused by the defendants. As the Supreme Judicial Court held over a century ago, "good will is property, and is a valuable asset in [an individual's] business." *George G. Fox Co.* v. *Glynn*, 191 Mass. 344, 348 (1906). The tortious interference claim thus seeks a remedy for an injury to a property interest. Consequently, it does survive. See *Sheldone* v. *Marino*, 398 Mass. 817, 819 (1986) (actions seeking redress for damage to property rights survive death).

As for the plaintiff's inclusion of a request for multiple damages as relief under G. L. c. 93A, the defendants characterize these as "punitive" damages, cf., e.g., *Drywall Sys., Inc.* v. *ZVI Constr. Co.*, 435 Mass. 664, 670 n.4 (2002), and assert that their availability does not survive Curtis's death.

No decision of either the Supreme Judicial Court or this court has ever held that punitive damages that are provided for by statute are unavailable for a claim that has survived the death of the plaintiff.[9] Nonetheless, the defendants here are not the first

---

[8]The defendants make the same argument with respect to the common-law trade dress claim, but in light of our conclusion that that claim is barred by principles of collateral estoppel, we need not address this alternative argument.

[9]"Under Massachusetts law, punitive damages may be awarded only by statute." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 856 n.20

to argue that under Massachusetts law punitive damages claims do not survive death. See, e.g., *Gasior* v. *Massachusetts Gen. Hosp.*, 446 Mass. 645, 653-655 (2006). This argument appears to derive from language in the single case cited by the defendants in its support, *Harrison* v. *Loyal Protective Life Ins. Co.*, 379 Mass. 212, 216-217 (1979). There, the Supreme Judicial Court said, " 'So long as the recovery of damages was regarded as a matter of personal vengeance and punishment as between the transgressor and his victim, death erased the purpose of a civil action between them. . . . [W]hen the function of damages awards came to be recognized as compensatory rather than punitive, the reason for the rule ceased to exist.' Smedley, Wrongful Death — Bases of the Common Law Rules, 13 Vand. L. Rev. 605, 608-609 (1960). Clearly, the passage of the Massachusetts Survival Statute [G. L. c. 228, § 1,] in abrogation of the common law represents the Legislature's acceptance of this logic." *Ibid.*

This passage, however, purports to explain the reason for abandonment of the common-law rule that damages claims abated upon death. It does not necessarily imply that requests for relief in the form of authorized punitive damages are unavailable in a case in which the claim otherwise survives. Indeed, courts ordinarily ask whether a "claim" survives death, not whether particular requests for relief do. In the only case we have found that addresses whether punitive damages are allowed on claims that at common law survived the death of the plaintiff, the court concluded that they are. See *Worrie* v. *Boze*, 198 Va. 533, 537 (1956) (deciding the question); *Worrie* v. *Boze*, 198 Va. 891, 892 (1957) (reaffirming earlier decision). And courts in most jurisdictions have concluded that when a claim survives an individual's death under the State's survival statute, his or her estate has available to it all of the damages that would have been available to the decedent had he or she lived, including punitive damages. See, e.g., *Murphy* v. *New York & New Haven R.R. Co.*, 29 Conn. 496, 499 (1861); *Pennsylvania R.R. Co.* v. *McCloskey's Administrator*, 23 Pa. 526, 530-531 (1854); *Earl* v. *Tupper*, 45 Vt. 275, 288 (1873). See also 1 Schlueter, Punitive Damages § 9.9(B), at

(1983). See *Boott Mills* v. *Boston & Me. R.R.*, 218 Mass. 582, 589 (1914) ("In this Commonwealth there is no such thing known to the common law as the recovery of punitive damages").

633 n.954 (5th ed. 2005) (collecting cases). Some States' survival statutes have been construed to prevent the survival of punitive damages, but where survival statutes are silent on the matter, as ours is, they have ordinarily been construed to allow all the damages that would have been available to the decedent if he or she were living. 1 Schlueter, *supra* at 631-632. See 1 Kircher & Wiseman, Punitive Damages: Law & Practice § 9:8, at 9-57 — 9-58 (2009) (unless a jurisdiction's survival statute bars punitive damages, "the estate or representative of a decedent to whom wrong was done [may] recover punitive damages in a survival action against the person responsible for causing the wrong").

The Supreme Judicial Court has not squarely addressed the question whether punitive damages are always available when a claim survives. Nonetheless, it decided recently that punitive damages may be awarded to the estate of a decedent in a common-law tort action for injury done to that decedent. *Matsuyama* v. *Birnbaum*, 452 Mass. 1, 37 n.61 (2008) (*Matsuyama*).[10] There, the Supreme Judicial Court held that punitive damages are available in a claim for "loss of chance" brought by a decedent's estate for harm done to the decedent in the form of his or her loss of chance of survival. Although ordinary wrongful death claims seek redress for injury done to a decedent's survivors, loss of chance claims seek redress for injury done to the person who died. Compare *id.* at 16 ("When a physician's negligence diminishes or destroys a patient's chance of survival, the patient has suffered real injury"), with *Thibert* v. *Milka*, 419 Mass. 693, 695 (1995) ("The purpose of the wrongful death statute is to compensate a decedent's survivors for the loss of the decedent's life"). Nonetheless, the Supreme Judicial Court held that punitive damages were available, despite the death of the injured party. *Matsuyama*, *supra* at 37 n.61. *Matsuyama* thus undermines the argument that under Massachusetts law statutorily authorized punitive damages may not always be sought where the claim for which they are authorized otherwise survives a plaintiff's death. Indeed, even if there is a principle that relief that is in some sense personal could not be sought on behalf of a decedent's estate, something that was assumed by the court in *Gasior* v.

---

[10]*Matsuyama*, *supra* at 23, involved a common-law cause of action for wrongful death. See *Gaudette* v. *Webb*, 362 Mass. 60, 71 (1972). The wrongful death statute provides for punitive damages. See G. L. c. 229, § 2.

*Massachusetts Gen. Hosp.,* 446 Mass. at 654-655 (*Gasior*), *Matsuyama, supra* at 37 n.61, suggests, consistent with the modern understanding of the systemic deterrent effect wrought by the availability of punitive damages, that claims for such damages are not merely personal.[11]

In any event, in this case we need not determine definitively whether otherwise authorized punitive damages are always available under Massachusetts law when an action survives death. This is because regardless of the answer to that question, under the Supreme Judicial Court's decision in *Gasior,* the multiple damages provided for by statute in G. L. c. 93A do survive.

The court in *Gasior* held, even before *Matsuyama,* that punitive damages provided for by the antidiscrimination statute, G. L. c. 151B, § 9, survive death. See *Gasior, supra* at 653-655. The court concluded that the punitive damages called for by that statute did "not merely vindicat[e] personal rights, but compris[ed] part of a scheme to vindicate a 'broader public interest in eradicating systemic discrimination,' " and that "[c]onsistent with the broad remedial purposes" of the statute, "to the extent a deceased plaintiff's . . . claim [under the statute] survives him, he should have available to him all of the remedies provided under the . . . statute." *Id.* at 654, quoting from *Stonehill College* v. *Massachusetts Commn. Against Discrimination,* 441 Mass. 549, 563 (2004). See *ibid.* ("We see no reason to distinguish as to statutory remedies between a plaintiff who has suffered the indignities of unlawful discrimination [if proved] and who survives, and a similarly aggrieved plaintiff who is deceased, simply because the exigencies of court scheduling may delay the granting of relief until after the plaintiff's death").

Even assuming that in some circumstances a claim for punitive damages may abate under Massachusetts law upon the death of the plaintiff, a question we do not decide, in light of *Gasior* multiple damages under G. L. c. 93A — even if characterized as

---

[11]Cf. 1 Kircher & Wiseman, Punitive Damages: Law & Practice, *supra* at 9-59 ("[A] particular jurisdiction's rationale for imposing punitive damages may largely dictate whether those damages are recoverable on behalf of a decedent's estate. For example, when the purpose underlying the imposition of punitive damages is to punish tortfeasors and deter future injurious conduct, one might reasonably posit that the death of a wronged individual is irrelevant to the issue of whether punitive damages are recoverable").

punitive in the sense that that word was used in *Harrison* v. *Loyal Protective Life Ins. Co.*, 379 Mass. at 216-217 — are available in this case despite the fact that the original plaintiff has died. The multiple damages provisions of c. 93A are part of a legislative scheme designed to serve a broad public interest in the eradication of unfair and deceptive practices in trade or commerce. Further, while the multiple damages provisions serve several purposes,[12] a "prime goal" of their inclusion in the statute is to serve the public interest in "reasonable settlement." See *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 857 (1983). Multiple damages are permitted under c. 93A in the commercial context only when the defendant either fails to tender with his answer a written offer for settlement, or the court finds that such a tendered offer was not reasonable. See G. L. c. 93A, § 11. In a c. 93A consumer action, damages may be multiplied only when the defendant has failed to respond to a demand letter with a reasonable offer for settlement. See G. L. c. 93A, § 9.

Multiple damages under c. 93A thus are necessary not only to vindicate the rights of the injured party, but also to serve these public interests. In these circumstances, even if punitive damages might sometimes be precluded by the death of the injured party in a case in which his or her claim otherwise survives, there is no reason to limit the statutory remedies available under G. L. c. 93A simply because relief is not granted until after the original plaintiff's death. Cf. *Gasior*, 446 Mass. at 653-654.

The judgment of dismissal is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[12]"Like other statutes containing multiple damage provisions, [G. L. c. 93A,] §§ 9 and 11[,] reflect 'the Legislature's displeasure with the proscribed conduct and its desire to deter such conduct and encourage vindictive lawsuits.' " *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. at 857, quoting from *McGrath* v. *Mishara*, 386 Mass. 74, 85 (1982). See *Haddad* v. *Gonzalez*, 410 Mass. 855, 875-876 (1991), citing Rice, New Private Remedies for Consumers: The Amendment of Chapter 93A, 54 Mass. L.Q. 307, 317 (1969) ("According to the principal draftsman of the statute, the damages provisions of c. 93A[, § 9,] are intended to remove economic disincentives to consumer actions, which typically involve small dollar amounts").